# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| DAVID L. MARTIN, )<br>   Plaintiff )<br> )<br>v. )<br> )<br>ANDREW SAUL,[1] )<br>  Commissioner of )<br>  Social Security, )<br>   Defendant )<br> ) | Civil Action No. 2:18cv00030<br><br>**MEMORANDUM OPINION**<br><br><br>By: Pamela Meade Sargent<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, David L. Martin, ("Martin"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted for Nancy A. Berryhill as the defendant in this case.

1

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Martin protectively filed applications for DIB and SSI on June 14, 2013, alleging disability as of September 19, 2012, based on low back pain; right leg pain; knee pain; muscle cramps; hepatitis C; pelvic pain; headaches; sciatic nerve problems; lymphatic sarcoidosis; anxiety; depression; memory problems; confusion; and insomnia.[2] (Record, ("R."), at 10, 282-83, 286-90, 330, 334, 354.) The claims were denied initially and upon reconsideration. (R. at 156-58, 162-64, 167-69, 173-75, 179-80, 182-84, 186-91, 193-95.) Martin then requested a hearing before an administrative law judge, ("ALJ"). (R. at 196-97.) A hearing was held on April 21, 2017, at which Martin was represented by counsel. (R. at 39-59.)

By decision dated June 13, 2017, the ALJ denied Martin's claims. (R. at 10-19.) The ALJ found that Martin met the nondisability insured status requirements of

---

[2] Martin has filed two previous applications for DIB and SSI. Specifically, he filed applications on September 14, 2007, alleging disability as of December 15, 2006. (R. at 63.) These claims were denied initially and on reconsideration, and thereafter, by an ALJ decision dated July 23, 2010. (R. at 63-80.) Martin filed additional applications for DIB and SSI on August 11, 2010. (R. at 90.) Pursuant to a remand order from the Appeals Council, a different ALJ held a hearing. This ALJ, who also is the ALJ who decided Martin's current claims, noted Martin's claims filed on August 11, 2010, were associated with his previous 2007 claims and that Martin was seeking a closed period of disability from December 15, 2006, through September 17, 2011, after which time he began working at a substantial gainful activity earnings level. (R. at 90.) By decision dated May 17, 2013, the ALJ denied Martin's claims for this closed period. (R. at 90-105.)

the Act for DIB purposes through December 31, 2013. (R. at 12.) The ALJ also found that Martin had not engaged in substantial gainful activity since the alleged onset date of September 19, 2012. (R. at 12.) The ALJ found that the medical evidence established that Martin suffered from severe impairments, namely sciatica/degenerative disc disease; extremity cramps; cellulitis; edema; hepatitis; obesity; depression; and anxiety, but he found that Martin did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.) The ALJ found that Martin had the residual functional capacity to perform simple, routine light work[3] that required no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; no exposure to workplace hazards; no strict production rate or pace requirements; and no more than occasional interaction with the public, co-workers and supervisors. (R. at 14.) The ALJ found that Martin was unable to perform his past relevant work, but other jobs existed in significant numbers in the national economy that he could perform, including jobs as a marker, a housekeeping cleaner and an addressing clerk. (R. at 17-18.) Thus, the ALJ found that Martin was not under a disability as defined under the Act from September 19, 2012, through the date of the decision, and was not eligible for DIB or SSI benefits. (R. at 18-19.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2019).

After the ALJ issued his decision, Martin pursued his administrative appeals, (R. at 277), but the Appeals Council denied his request for review. (R. at 1-5.) Martin then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2019).

(2019). The case is before this court on Martin's motion for summary judgment filed February 25, 2019, and the Commissioner's motion for summary judgment filed April 29, 2019.

## II. Facts[4]

Martin was born in 1976, (R. at 282, 286), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and past relevant work experience as a construction laborer and a heavy truck driver. (R. at 43, 55, 335.) At his hearing on April 21, 2017, Martin testified he had continued to work recently, helping his landlord clean up around his trailer park, including mowing grass. (R. at 48-49.) He stated he also helped his uncle mow grass, and he testified he had been doing some landscaping work over the previous couple of years. (R. at 49-50.) He stated he helped his wife, who had undergone a leg surgery, with household chores and shopping. (R. at 51.) Martin testified he was taking Subutex for pain, and he had received a driving under the influence, ("DUI"), charge three to four years previously. (R. at 51.) He admitted to a prior problem with pain pills, and he stated the Subutex was for the "pain part of it." (R. at 52.) Martin also stated he was taking Celexa and Klonopin. (R. at 52.) Martin testified he could not work due to anxiety, and he could not stand to be around anyone. (R. at 52, 54.) He further stated he had extremity cramps that were embarrassing if anyone was around, which only served to fuel his anxiety. (R. at 52-53.) Martin testified he suffered from such cramps about 10 times daily, and they could last for up to an hour. (R. at 53.)

---

[4] Martin's sole argument on appeal to this court relates to his mental health impairments. That being the case, I will restrict my discussion of the medical evidence to Martin's mental impairments and associated treatment and findings.

4

Mark Hileman, a vocational expert, also was present and testified at Martin's hearing. (R. at 55-57.) Hileman classified Martin's past work as a construction worker I as heavy[5] and semi-skilled and as a heavy truck driver as medium[6] and semi-skilled. (R. at 55-56.) Hileman was asked to consider a hypothetical individual of Martin's age, education and work history, who could perform simple, routine light work that required no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; that did not require work around hazards, such as hazardous machinery and unprotected heights; that did not require strict production rates or pace requirements; and that required no more than occasional interaction with the public, co-workers and supervisors. (R. at 56.) Hileman testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a marker, a housekeeping cleaner and an addressing clerk. (R. at 56-57.)

In rendering his decision, the ALJ reviewed medical records from Danville Medical Center; D. Kaye Weitzman, L.C.S.W.; Holston Valley Medical Center, ("Holston Valley"); Eric Johnson, Ph.D.; Crystal Burke, L.C.S.W.; Dr. Esther Ajjarapu, M.D.; University of Virginia Health System, ("UVA"); Lee Regional Medical Center; Lonesome Pine Hospital, ("Lonesome Pine"); Dr. Randall J. Falconer, M.D.; Stone Mountain Health Services; Appalachia Family Health Center; Pennington Family Health; St. Charles Health Clinic; Holston Regional Comprehensive Medicine; Jonesville Family Health; Brandon Bogle, Ph.D., a

---

[5] Heavy work involves lifting items weighing up to 100 pounds at a time and lifting and carrying items weighing up to 50 pounds frequently. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2019).

[6] Medium work involves lifting items weighing up to 50 pounds at a time and lifting and carrying items weighing up to 25 pounds frequently. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2019).

5

licensed clinical psychologist; Paige Cordial, Psy.D., a licensed clinical psychologist; Dr. R. S. Kadian, M.D., a state agency physician; Dr. Patricia Staehr, M.D., a state agency physician; Stonsa N. Insinna, Ph.D., a state agency psychologist; and Bryce Phillips, Psy.D., a state agency psychologist.

Mullins received Subutex treatment for opioid abuse from Dr. Randall J. Falconer, M.D., during the relevant time period, including from August 2012 through July 2013. At each visit, Martin rated his anxiety, sleep and drug cravings on a five-point scale.[7] Over this time, he rated his anxiety and his sleep between a four and a five and his cravings between a three and a five. (R. at 722-35.) He indicated his stressors to include work, lack of work, everyday life, home life and finances. (R. at 722-35.) On April 1, 2013, Martin stated he was "stressed out of [his] mind," and on July 18, 2013, he stated his "nerves [were] shot." (R. at 722, 726.) On April 26, 2013, Martin reported he was isolating himself. (R. at 725.) On June 20, 2013, he reported he and his wife had been thrown out of his mother's residence, and they were living with friends. (R. at 723.) Over this time period, Martin's mood/affect, generally, was deemed to be flat, and his anxiety was deemed to be between medium and high. (R. at 722-35.) Martin's condition was assessed as unstable on only one occasion, on August 13, 2012, when he had admitted to using opiates for two to three days a couple of weeks previously. (R. at 735.) Martin consistently denied thoughts of suicide or self-harm, and he indicated he was not attending substance abuse recovery meetings or any type of counseling. (R. at 722-35.)

---

[7] With regard to anxiety and cravings, a rating of one indicated "none," while a rating of five indicated "severe." (R. at 722.) With regard to sleep, a rating of one indicated "excellent," while a five indicated "poor." (R. at 722.)

On May 1, 2014, Martin saw Dr. Esther Ajjarapu, M.D., at Pennington Family Health Center, for a follow up on a leg abscess with cellulitis. (R. at 763-69, 810-12.) His history of anxiety and depression, as well as opioid addiction, was noted. (R. at 765, 767, 810.) It further was noted he was in Suboxone treatment.[8] (R. at 765, 767, 810.) Martin denied symptoms of depression or anxiety at that time, and a mental status examination revealed he was alert and oriented with appropriate judgment, good insight, intact recent and remote memory, a euthymic mood and an appropriate affect. (R. at 768, 811.) He returned to Dr. Ajjarapu on four subsequent occasions, from May 8 through July 17, 2014, for follow-up examinations. At each of these appointments, Martin denied depression and anxiety, and his mental status examinations remained unchanged and completely normal. (R. at 741, 743, 752, 760-61, 801, 805-06.)

On August 8, 2014, Bryce Phillips, Psy.D., a state agency psychologist, indicated there was insufficient evidence to show Martin's condition to be of such severity as to be considered disabling. (R. at 120, 127.) It appears that Martin did not contact the Agency despite multiple requests that he do so. (R. at 119, 127.) A "[f]ailure to [c]ooperate" was noted. (R. at 119, 127.)

Martin began monthly Suboxone treatment with Dr. Michael Wysor, M.D., Ph.D., at Holston Regional Comprehensive Medicine on October 30, 2014. (R. at 840.) At each visit, Martin was asked to rate, among other things, his current level of anxiety on a scale of zero to four, with zero being "not at all" and four being "extremely." He also was asked to list the things he found the most stressful during

---

[8] Suboxone and Subutex are both brand formulations of the drug buprenorphine, which is used to treat opioid addiction. *See* www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf (last visited Mar. 4, 2020).

7

the preceding week. From October 30, 2014, to March 13, 2015, Martin rated his anxiety between a three and a four, and his stressors included "everyday life," issues with his job, moving, finances, personal and family issues, difficulty finding employment and his wife's recovery from a broken arm and associated legal proceedings. (R. at 820, 824, 827-28, 831, 834, 837, 840.) On November 7, 2014, Dr. Wysor noted Martin suffered from everyday stress and social anxiety. (R. at 834.) On November 21, 2014, Martin reported having used Xanax and Klonopin for an anxiety attack. (R. at 831.) Dr. Wysor continued Martin on Klonopin at that time, and on December 19, 2014, he also prescribed Neurontin. (R. at 830-31, 833.) Over this time, Martin endorsed anxiety and depression, and Dr. Wysor diagnosed the same. (R. at 822-23, 832-33, 839.)

On February 20, 2015, Stonsa Insinna, Ph.D., a state agency psychologist, noted Martin's failure to cooperate in the processing of his claim, which resulted in insufficient evidence to make a determination. (R. at 138, 147.)

Martin continued monthly Suboxone treatment with Dr. Wysor from April 2015 to February 2017. Over this time, Martin again rated his anxiety between a three and a four. (R. at 814, 817, 842, 845, 848, 851, 854, 857, 860, 863, 867, 870, 873, 876, 879, 882, 885, 916, 919, 922, 925, 928, 931, 934.) He listed his stressors as moving due to issues with his landlord and another tenant; "everyday life as an addict;" family issues; being his own boss; his grandmother's death; everyday stress; health issues; his wife's incarceration; adjusting to a Suboxone dosage change; the change of seasons; moving in with his parents; issues with his in-laws; trying to find a full-time job; thoughts about using substances; physical pain; his wife undergoing an additional surgery; inability to afford his Neurontin; and his wife "complaining about everything." (R. at 814, 817, 845, 848, 851, 854, 857, 860, 863, 867, 870,

873, 876, 879, 882, 885, 916, 919, 922, 925, 928, 931, 934.) Over this time, Martin consistently endorsed anxiety and depression, and Dr. Wysor diagnosed the same. (R. at 815-16, 818-19, 846-47, 849-50, 852-53, 855-56, 858-59, 861-62, 864-65, 868-69, 871-72, 874-75, 877-78, 880-81, 883-84, 886-87, 917-18, 920-21, 923-24, 926-27, 929-30, 932-33, 935-36.) On June 12, 2015, Martin reported working for himself, which was both "very stressful and aggravating," but "beneficial." (R. at 863.) On July 17, 2014, he reported being very bothered by a death in the family, almost to the point of using substances. (R. at 860.) On August 14, 2015, Martin reported some withdrawals after his Suboxone dosage was decreased. (R. at 857.) On January 8, 2016, he reported being "really depressed" and having "[n]othing to look up to." (R. at 842.) On February 11, 2016, Martin advised Dr. Wysor he had been thinking about using, but did not know why. (R. at 885.) On April 8, 2016, Martin stated he had experienced at least four panic attacks weekly for the prior month, requiring him to take two Klonopin to calm down. (R. at 879.) He stated these panic attacks were worsening and requested an increase in his Klonopin. (R. at 879.) On October 28, 2016, Martin again requested a Klonopin increase, stating he feared a heart attack or nervous breakdown without it. (R. at 928.)

Martin presented to Jonesville Family Health Center on May 18, 2016, to re-establish care, complaining of various physical issues. (R. at 904.) It was noted that Martin was taking Klonopin. (R. at 905.) He denied depression, anxiety, suicidal thoughts or attempts and disturbing thoughts or feelings. (R. at 905.) A mental status examination revealed Martin was alert and oriented with appropriate judgment, good insight, a euthymic mood and an appropriate affect. (R. at 905-06.) On a depression screening, Martin did report being down, depressed or hopeless more than half the days over the prior two weeks. (R. at 906.) A urine drug screen was positive for benzodiazepines. (R. at 907.) Sarah Janie Evans, N.P., a nurse

9

practitioner, suggested a referral for counseling. (R. at 906.) Martin returned on July 5, 2016, again with various physical complaints. (R. at 901.) At that time, Martin noted he had little or no interest in doing things, as well as feeling down, depressed or hopeless, more than half the days over the previous two weeks. (R. at 902.) On July 27, 2016, Martin saw Dr. Abdul-Latief Almatari, M.D., for a follow-up appointment for back and hip pain after falling while sleepwalking. (R. at 897.) He endorsed anxiety, but denied depression. (R. at 898.) On mental status examination, Martin's speech was slow, slurred and drowsy to some degree, but he was pleasant and cooperative, and he was fully oriented with a low mood and a blunted affect. (R. at 898-99.) Martin reported having little or no interest in doing things, as well as feeling down, depressed or hopeless, several days over the previous two weeks. (R. at 899.) On October 7, 2016, Martin advised nurse practitioner Evans he felt "alright." (R. at 893.) On mental status examination, Martin was alert and oriented with appropriate judgment, good insight, a euthymic mood and an appropriate affect. (R. at 894-95.) On November 10, 2016, Martin told Evans he wanted to stop Suboxone and that the clinic was weaning him off Klonopin and starting Celexa. (R. at 889.) He reported feeling down, depressed or hopeless several days over the previous two weeks. (R. at 891.) A mental status examination again was normal and unchanged from previously. (R. at 890-91.) Martin returned to Evans on January 11, 2017, reporting having little or no interest in doing things, as well as feeling down, depressed or hopeless, several days over the previous two weeks. (R. at 978.) Mental status examination was normal and unchanged. (R. at 979.) On February 8, 2017, the only changes noted were Martin's description of having little or no interest in doing things, as well as feeling down, depressed or hopeless, which was changed to "more than half the days" over the previous two weeks, and on mental status examination, his mood was described as "friendly" as opposed to euthymic. (R. at 973.)

Martin saw Brandon Bogle, Ph.D., a clinical psychologist at Jonesville Family Health Center, for a behavioral health intake on February 2, 2017. (R. at 998.) He reported no previous mental health medications or treatment. (R. at 998.) Martin also reported interpersonal problems with his wife, as well as depression. (R. at 998.) He advised Bogle his work history included building prisons throughout the country, which he enjoyed, as well as working in the mines for "a bit," which he did not like. (R. at 998.) Martin stated he had worked multiple other jobs, but none of them "stuck" due to his drug usage. (R. at 998.) He stated he currently was self-employed, and he also worked for his uncle. (R. at 998.) Martin appeared to have a strong desire to improve his life, and Bogle recommended individual therapy. (R. at 998.) A self-reported anxiety screening indicated Martin was experiencing severe anxiety, and Bogle diagnosed him with major depressive disorder, recurrent, moderate; other mixed anxiety disorders; opioid dependence, in remission; and problems in his marital relationship. (R. at 1000.) Martin returned for therapy with Bogle on February 21, 2017, noting his wife recently had been released from jail, and he had been involved in a confrontation with his uncle, which was very upsetting to him. (R. at 993.) An anxiety screening again indicated severe anxiety, and a depression screening indicated moderately severe depression. (R. at 995.) Bogle's diagnoses of Martin remained the same. (R. at 995.) On March 7, 2017, Martin reported an improved marital situation, noting he and his wife had disagreements from time to time, but no major fights. (R. at 989.) He also reported his mood was "okay," and he was staying busy helping his landlord and making a bit of money on the side. (R. at 989.) Self-reported testing again indicated severe anxiety and moderately severe depression, and Bogle's diagnoses of Martin remained the same. (R. at 990-91.) When Martin saw Bogle on April 4, 2017, he noted things were continuing to go well with his wife, but she had been psychiatrically hospitalized that morning after feeling suicidal. (R. at 983.) Martin advised Bogle he was

considering stopping Suboxone treatment and seeking treatment at a pain clinic, as he believed he would be able to take his medications without abusing them. (R. at 983.) Bogle discussed this in light of the difficulties Martin had experienced previously, and they discussed stress management. (R. at 983.) Martin stated he enjoyed fishing and was looking forward to going soon. (R. at 983.) He reported being nervous about his upcoming disability hearing. (R. at 983.) Self-reported testing again indicated severe anxiety and moderately severe depression, and Bogle's diagnoses of Martin remained unchanged. (R. at 985.)

Martin saw Paige Cordial, Psy.D., a licensed clinical psychologist, for a consultative evaluation on March 14, 2017, at his counsel's referral. (R. at 1003-10.) At this evaluation, Cordial made behavioral observations, conducted a clinical interview, reviewed various of Martin's records and performed assessments. (R. at 1003-10.) Mental status examination revealed Martin had good grooming and hygiene; eye contact was variable, ranging from poor to within normal limits; he appeared sluggish and spoke somewhat slowly; he appeared depressed, but not overtly anxious; he completed most test items independently, but became mentally fatigued toward the end; concentration was adequate for most of the session, only losing track of the question he was answering once or twice; he did not display significant memory problems or any signs of psychotic symptoms; he was cooperative; he appeared to be of average intelligence; and he had good insight and judgment. (R. at 1003.) Martin reported currently taking Subutex, Klonopin and Neurontin, and he stated he had attended counseling previously, but quit because he did not like the counselor. (R. at 1004.) Martin reported a low energy level for about a year; sleep issues due to pain; a poor appetite; low motivation; isolating himself from others because he could not get along with them and believed everyone was lying to him; having a "pretty hateful" and depressed mood for a while; loss of

interest in things he once enjoyed; feelings of guilt; crying episodes; anger issues and frequently arguing with his wife; racing thoughts "all the time;" some difficulty focusing; frequent forgetfulness; not liking to go anywhere; and experiencing about three panic attacks weekly. (R. at 1007.) Martin denied suicidal thoughts or a history of suicidal attempts. (R. at 1007.) He reported his last "actual job" was driving a coal truck in 2012 and 2013 until the mine closed. (R. at 1004.) Martin stated he had not worked since that time due to his health. (R. at 1004.)

Cordial administered the Beck Depression Inventory, Second Edition, ("BDI-II"), a self-report measure of depression, which was suggestive of severe depressive symptoms. (R. at 1008.) She also administered the Burns Anxiety Inventory, ("BAI"), a self-report scale of anxiety, which reflected Martin currently was reporting extreme anxiety symptoms. (R. at 1008.) Lastly, the Personality Assessment Inventory, Second Edition, ("PAI-II"), a self-administered, objective test of personality, was deemed valid, although there was some suggestion of symptom exaggeration, which Cordial noted could be due to Martin's negative thinking associated with depression. (R. at 1008.) The PAI-II suggested Martin's level of worry may compromise his ability to focus and attend; he likely would experience problems with concentration and decision making; he likely would have few interpersonal relationships or be dissatisfied with them; he probably was isolated from others and tended to feel misunderstood; working relationships with others likely would be strained and may require an unusual level of support to be successful; and he was likely to be chronically angry and to freely express anger and hostility. (R. at 1008-09.) Cordial diagnosed Martin with major depressive disorder, recurrent, moderate; panic disorder; generalized anxiety disorder; and other specified personality disorder, paranoia personality disorder traits. (R. at 1010.) She opined he would benefit from ongoing, longer term and consistent behavioral health

treatment with a focus on relationship problems, in addition to anxiety and depression. (R. at 1010.)

Cordial also completed a check-box mental assessment of Martin, dated April 14, 2017, opining he was mildly[9] limited in his ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 1011-13.) She opined he was moderately[10] limited in his ability to function independently; to maintain attention/concentration; to understand, remember and carry out both detailed and complex job instructions; and to demonstrate reliability. (R. at 1011-12.) Cordial further opined Martin was markedly[11] limited in his ability to relate to co-workers; to use judgment in public; to interact with supervisors; to deal with work stresses; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1011-12.) Finally, she opined he was extremely[12] limited in his ability to deal with the public. (R. at 1011.) Cordial noted she was basing these findings on Martin's problems with anxiety, panic, depression, anger and relationships. (R. at 1011-13.) She opined Martin would miss more than two workdays monthly. (R. at 1013.)

---

[9] This form defines a mild limitation as only a slight limitation, leaving the individual with the ability to generally function well. (R. at 1011.)

[10] A moderate limitation is defined on the form as more than a slight limitation, but the individual still can function satisfactorily. (R. at 1011.)

[11] A marked limitation is defined on the form as a serious limitation with substantial loss in the ability to effectively function, resulting in unsatisfactory work performance. (R. at 1011.)

[12] This form defines an extreme limitation as a major limitation, resulting in no useful ability to function. (R. at 1011.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2019).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Martin argues that the ALJ improperly determined his mental residual functional capacity by according improper weight to the opinion of psychologist Cordial. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.)

15

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ found that Martin had the residual functional capacity to perform simple, routine light work that required no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; no exposure to workplace hazards; no strict production rate or pace requirements; and no more than occasional interaction with the public, co-workers and supervisors. (R. at 14.) In reaching this residual functional capacity finding, the ALJ stated that he was giving Cordial's opinion "little weight" for various reasons. (R. at 16.) First, the ALJ noted its validity was called into question by Martin's "apparent misrepresentation of his [work] history." (R. at 16.) Specifically, the ALJ stated Martin had incorrectly advised Cordial he had not worked at all since 2013, as his testimony and additional records indicated he was working up to and including 2017. (R. at 16.) This misrepresentation, the ALJ stated, called into question the credibility of the other information provided by Martin during the examination. (R. at 16.) The ALJ is correct that Martin did, in fact, advise Cordial that he had had not worked since 2013. He also is correct that Martin testified to the contrary, and the records include multiple notations of Martin performing various work activities after 2013. For example, at his April 2017 hearing, Martin testified he had worked recently helping

his landlord clean up around his trailer park, including mowing grass. Additionally, he testified he helped his uncle mow grass, and he advised the ALJ he had been performing some landscaping work over the previous couple of years. Likewise, over the time Martin treated with Dr. Wysor, from October 2014 to February 2017, he made repeated statements regarding his work being stressful, working hard, being his own boss and having difficulty doing "the jobs" after his wife required additional surgery. Also, in February 2017, Martin advised psychologist Bogle he was self-employed at that time, and he also worked for his uncle. The ALJ also correctly stated that Martin's ongoing work activity demonstrated an ability to engage in work-related activities. (R. at 17.)

The ALJ also found that the significant limitations imposed by Cordial were not supported by the other evidence of record. (R. at 16.) *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (2019) (generally, the more consistent and supported a medical opinion is with the record as a whole, the more weight it will be given). For instance, despite Cordial's opinion that Martin was markedly limited in his ability to relate to co-workers and interact with supervisors, there is no evidence in the record of Martin having prior difficulties doing so. There is no evidence he was ever disciplined at or fired from a job. Martin did allege having some social anxiety, anger issues and some interpersonal issues with his wife, but the ALJ appropriately accounted for his limitations in this area by restricting him to no more than occasional interaction with the public, co-workers and supervisors. Cordial's opinion that Martin was markedly limited in his ability to deal with work stresses also is not supported by the record evidence. Although Martin complained of being under a lot of stress due to his work, he was successfully treated with medications, including Klonopin and Celexa, as evidenced by his repeated normal mental status examinations. "If a symptom can reasonably be controlled by

medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, despite Martin's allegations of multiple panic attacks weekly, there is no evidence in the record that he ever sought any emergent treatment for such complaints. Cordial's opinion that Martin was markedly limited in his ability to behave in an emotionally stable manner and to relate predictably in social situations also is not supported by the record evidence. As stated above, mental status examinations of Martin consistently were unremarkable, including being alert and oriented with appropriate judgment, good insight, intact recent and remote memory, a euthymic mood and an appropriate affect. Moreover, Cordial, in her own evaluation, found Martin to be cooperative. In July 2016, Dr. Almatari noted Martin's speech was slow and slurred, and drowsy to some degree, but he was fully oriented, pleasant and cooperative. Cordial also noted Martin appeared sluggish and spoke somewhat slowly. These findings appear to be an aberration, but I find that the ALJ's restriction of Martin to simple work that required no strict production rate or pace requirements adequately accounts for this. Finally, the court notes that Cordial opined Martin was markedly limited in his ability to use judgment in public, but her own evaluation included a finding that he had good judgment.

The ALJ's decision reveals that he also considered Martin's alleged memory difficulties, his longstanding diagnoses of depression and anxiety, that he had difficulty maintaining relationships and had reported a history of irritability and major relationship problems, that he had alleged some difficulty with confusion, that he exhibited some deficits in concentration in March 2017 when he occasionally lost track of the questions he was answering and exhibited mental fatigue toward the conclusion of the evaluation and that he alleged experiencing a great deal of stress throughout his treatment records. (R. at 13-14.) As stated above, however, the ALJ's residual functional capacity finding adequately accounts for such limitations.

The ALJ stated he was giving "significant weight" to the residual functional capacity finding contained in the prior decision from May 17, 2013. (R. at 16-17.) *See* Acquiescence Ruling, ("A.R."), 00-1(4), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) (ALJ must consider prior findings made in a final decision by an ALJ as evidence and give them appropriate weight in light of all the relevant facts and circumstances when adjudicating a subsequent disability claim.) Previously, the same ALJ had found Martin could perform simple, routine, repetitive light work that required no more than occasional postural activities, with the exception of no climbing ladders or ropes; that required no work around hazards; and that required no more than occasional interaction with others. (R. at 16.) In the current decision, the ALJ noted the current residual functional capacity finding was essentially unchanged from the prior one, noting that the more recent evidence did not establish any significant change in Martin's condition since May 2013. (R. at 16-17.)

In addition to the ALJ's stated reasons for giving little weight to Cordial's opinion, the court also notes that Martin saw Cordial on one occasion, not for treatment purposes, but for the sole purpose of generating evidence for his disability claim. *See Mefford v. Berryhill*, 2018 WL 7550260, at *8 (W.D. Va. Oct. 11, 2018) (citing *Holman v. Astrue*, 2012 WL 2678933, at *7 (M.D. Tenn. May 31, 2012) ("Because Dr. Blevins only examined Plaintiff one time, at the request of his attorney, specifically for the purposes of determining Plaintiff's ability to perform work-related activities, and because his findings were inconsistent with the [other substantial evidence of record], the ALJ properly accorded little weight to Dr. Blevins' opinion.")). Therefore, Cordial's opinion is entitled to less weight for this reason, as well. Furthermore, Cordial's opinion appears to rely heavily on Martin's subjective allegations. Two of the three tests administered to Martin by Cordial

during her consultative evaluation were self-report assessments based on Martin's allegations, while the third suggested possible symptom exaggeration. A physician's opinion based upon a claimant's subjective complaints is not entitled to deference and should be rejected. *See Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005).

Lastly, the court notes that Cordial's opinions are contained in a check-box form, which this court has found are not entitled to great weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form report, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-the-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician)).

Based on all the above, I find that substantial evidence exists in the record to support the ALJ's weighing of the medical evidence, as well as his mental residual functional capacity finding and ultimate finding that Martin was not disabled. An appropriate Order and Judgment will be entered.

DATED: March 18, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE